*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CHRISTOPHER C., ) | |
| ) | Supreme Court No. S-14892 |
| Appellant, ) | |
| ) | Superior Court Nos. 4FA-07-00051 CN |
| v. ) | and 4FA-10-00020/00032/00033 CN |
| ) | |
| STATE OF ALASKA, ) | O P I N I O N |
| DEPARTMENT OF HEALTH & ) | |
| SOCIAL SERVICES, OFFICE OF ) | No. 6790 - June 28, 2013 |
| CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |
| THERESE C., ) | |
| ) | |
| Appellant, ) | Supreme Court No. S-14894 |
| ) | |
| v. ) | Superior Court Nos. 4FA-07-00051 CN |
| ) | and 4FA-10-00020/00032/00033 CN |
| STATE OF ALASKA, ) | |
| DEPARTMENT OF HEALTH & ) | |
| SOCIAL SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeals from the Superior Court of the State of Alaska,
Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Christopher C. Elizabeth Leduc and Rachel Cella, Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Therese C. Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee, State of Alaska.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

The superior court terminated the parental rights of Christopher and Therese C. to four of their children.[1] In doing so the court relied primarily on evidence that neither Christopher nor Therese had acquired the basic skills necessary to safely parent their children, despite more than a year of parenting training facilitated by the Alaska Department of Health & Social Services, Office of Children's Services (OCS). The superior court also relied on the fact that Therese, who had a history of substance abuse, had not maintained sobriety long enough to justify a finding that she was unlikely to relapse, adding to the dangers faced by children in her care. Christopher and Therese both appealed. Both challenge the superior court's findings that (1) they failed to remedy conduct that endangers their children; (2) OCS made active efforts to prevent the breakup of their family; (3) their children will likely suffer serious physical or emotional harm if returned to the parents' custody; and (4) termination of their parental rights is in their children's best interests. Each of these findings is supported by the evidence in the

---

[1] Pseudonyms are used for family members and foster parents to protect their privacy.

record. We therefore affirm the superior court's order terminating the parental rights of Christopher and Therese.

## II.    FACTS AND PROCEEDINGS

### A.    The Family

Christopher and Therese began dating as teenagers in 2001 or 2002. Over the next ten years they had six children together. At issue in this appeal are their parental rights to four of those children: Eric, Cal, Zander, and Chris,[2] all Indian children for purposes of the Indian Child Welfare Act (ICWA).[3] The oldest boy, Eric, was born in 2004. At the time of trial he was living in a therapeutic foster home in Fairbanks — a potentially permanent, adoptive placement — where he was participating in weekly therapy sessions. Cal was born in 2006, Zander in 2008, and Chris in 2010. These boys live in Nenana with their foster parents, Sofie Innis and Rita Olech. The home is a potentially permanent placement for the three boys, as Innis and Olech wish to adopt them.

### B.    OCS's Involvement With The Family Before July 2010

Between 2004 and May 2007 OCS received several reports alleging that Christopher and Therese were abusing substances and neglecting their children; these reports were not investigated, "screened out" for various reasons, or investigated and not substantiated. In May 2007 OCS received a report that Therese was passed out in her basement surrounded by garbage and beer bottles while the children played next to her, that Christopher was also high, that the basement smelled of methamphetamine, and that the house was being "used as a crash pad for other drug users." OCS investigated and

---

[2]    Christopher and Therese's two other children, not involved in this proceeding, are Cara, who was born in 2005 and lives with Therese's mother, and Mitchell, who was born in 2012 and is in OCS's custody, in foster care.

[3]    25 U.S.C.A. §§ 1901 et seq.

asked the parents to submit to urinalysis testing, which came back positive for marijuana for both of them. When follow-up investigations revealed no further evidence of substance abuse, OCS closed its case, but it did refer the parents to a local Head Start program and to Denali Kid Care, and it provided information about other services as well.

The following month OCS received a report of domestic violence between Therese and Christopher and took Cal into emergency custody.[4] OCS placed the boy with Christopher's mother, who was already caring for Eric. OCS made referrals for Christopher and Therese for housing and medical services; provided them with case management services, food, and transportation; and contacted their relatives. The parents stipulated to Cal's adjudication as a child in need of aid and worked with OCS to develop a case plan. The plan called for Therese to participate in a substance abuse assessment and treatment, a parenting assessment, and domestic violence classes, and for Christopher to participate in parenting classes and an anger management assessment.

In late 2007 Therese attempted suicide, and OCS referred her to Maniilaq Counseling Center for a psychological assessment. She was accepted at the center for treatment, which OCS anticipated would address her substance abuse, mental health, and parenting issues, but Therese, who was pregnant with Zander, did not participate in the program. Instead she moved to Shungnak. Christopher, who had admitted having issues with anger control, participated in a behavioral assessment that recommended he complete an anger management program, and OCS referred him to the Alternatives to Violence program at LEAP. He had difficulty with attendance, but OCS intervened on his behalf and he eventually completed the program.

In May 2008, while OCS's permanency goal for Cal was the reunification of his family, OCS acted on a report that Christopher's mother was unable to care for Cal

---

[4] It appears that Cal was the only child then living in the home.

and Eric due to physical disabilities, and Cal was moved to foster care in the Innis and Olech home in Nenana.[5] Earlier in the year Therese had begun residential substance abuse treatment at Dena A Coy in Anchorage, and she successfully completed the program in July 2008. While in the program she gave birth to her fourth child, Zander. OCS did not take custody of Zander, but Therese was unable to keep him with her in treatment; she voluntarily placed him in the care of Innis and Olech, who were already caring for Cal.

After completing the treatment program at Dena A Coy, Therese returned to Shungnak, then moved back to Fairbanks. There, in November 2008, she was residing at the Interior Alaska Center for Non-Violent Living when OCS placed Cal with her for a trial home visit. But in January 2009 Therese was asked to leave the Center "after an incident of intoxication and assaultive behavior towards staff," and Cal was returned to his foster home in Nenana. OCS then helped Therese transition to Our Grandmother's House, a Fairbanks domestic violence shelter serving Alaska Natives. In February 2009 Therese participated in a behavioral health evaluation, after which she entered a residential treatment program at the Women and Children's Center for Inner Healing in Fairbanks. But she left that program after just three days, and the next day, March 1, she was arrested for assaulting Christopher and his mother. Her blood-alcohol content on arrest was .198. Upon her release OCS helped her enter the Fairbanks Rescue Mission, but later in March she was arrested for violating probation conditions, including "drinking of a whole bottle of alcohol." She served 15 days in jail, returned to the Rescue Mission in May 2009, and was asked to leave in June. In September 2009 OCS paid for her and

---

[5] The record is not clear where Eric, who was not in OCS's custody, went at this time.

Zander to go to Anchorage so that she could once again enter residential treatment at Dena A Coy.

In October 2009 OCS placed Cal with Christopher for a trial home visit. Christopher was then living with and caring for his mother, who was confined to a wheelchair, and had Eric in the household as well.

In December 2009 Therese left Dena A Coy without completing treatment and entered another treatment program at Stepping Stones Treatment Center in Anchorage; she left that program the following month. Homeless and unable to care for Zander, she asked the foster parents, Innis and Olech, to take him in again, which they did. In February 2010 Therese returned to Our Grandmother's House for sober living support, testing positive for marijuana and cocaine upon admission; later that month she gave birth to her fifth child, Chris, and both she and the baby tested positive for marijuana. OCS took Chris into its custody and placed him in foster care in Fairbanks. OCS hoped that placing Chris locally rather than in Nenana, with Innis and Olech, would help him bond with his parents and would help Christopher and Therese in their efforts toward unification with the baby.

On March 1, 2010, Therese completed another substance abuse assessment, which recommended that she participate in a "high intensive" residential treatment program. Later that month she was asked to leave Our Grandmother's House for violating its rules, and the following month she was arrested for committing an assault while intoxicated. She pleaded no contest to two counts of assault in the fourth degree and was placed on probation for 18 months; a condition of her probation was that she not use alcohol. She then entered a residential treatment program at the Women and Children's Center, which she successfully completed in October 2010.

Sometime before March 2010 Zander left the care of Innis and Olech and joined his brothers Eric and Cal in Christopher's home. In early March 2010 Christopher

told an OCS representative that he was willing to work with a family support worker to improve his ability to care for his children and to develop plans to address his children's health and educational needs.

Several days later OCS filed a non-emergency petition for temporary custody of Eric and Zander. The petition was based on concerns about domestic violence, neglect, Therese's mental condition and substance abuse issues, and Christopher's failure to protect the children from Therese's endangering behaviors. The children remained in Christopher's care subject to monthly visits by OCS. A Court-Appointed Special Advocate also visited the home regularly, as did staff from the Resource Center for Parents and Children (Resource Center), which had been referred by OCS to provide services as part of an intensive parenting program for Christopher, Therese, and their children. OCS also provided Christopher with daycare assistance, transportation, food, a referral for drug testing, and help with applying for public assistance, enrolling the children in school, and establishing his paternity of Zander and Chris. In addition, OCS helped Christopher obtain new birth certificates for the children that listed him as their father. With these in hand Christopher could obtain cards for the children from the Bureau of Indian Affairs (BIA), which would entitle them to medical care at Chief Andrew Isaac Health Center.[6]

### C. OCS's Involvement With The Family From July 2010 Until The Termination Of Parental Rights In 2012

In early July 2010 OCS social worker Justin Heminger visited Christopher's home, saw that the children were sick, and asked Christopher whether he had taken them to the doctor. Christopher responded that he had and had been given prescriptions to treat ear infections. Heminger concluded that Christopher had not filled the prescriptions,

---

[6] Without BIA cards Christopher was limited to a single doctor's visit at the Center for each child, but there was no restriction on his access to the emergency room.

however, because he had lost one and the boys tore up the other, and he had not tried to get new ones.[7]

On July 16, 2010, OCS investigated a report that the children were again ill and uncared for and that Christopher's home was unsanitary. A social worker found that Christopher and his mother had gone berry picking and had left the children in the care of two teenagers, ages 14 and 15. The home was filthy, with garbage on the floor, dirty dishes in the sink, spoiled food in the refrigerator, and kitchen knives within the children's reach. The boys were sharing a mattress on the floor, with no bedding, despite the fact that Zander had an "extremely contagious" staph infection. The social worker took Zander to the emergency room, where he was treated for the staph infection, a severe ear infection, and flu. Zander's diaper had not been changed in so long that the feces in it were decomposing. His skin was so encrusted with feces and mucus that he bled when hospital staff cleaned him. His clothing was too filthy to be returned to him, so he left the hospital in a gown. OCS placed him with Innis and Olech.

OCS removed Eric and Cal from Christopher's home shortly thereafter. Eric's mouth was infected and he needed dental work, including removal of some teeth, and Cal, like Zander, had a staph infection. OCS placed both boys with Innis and Olech, who reported that the boys hoarded food and hid it in their beds. Heminger, an expert in assessing risk and safety threats in this context, testified that such behavior is typical of children who have been deprived of food.

Following the July 2010 removals, Christopher proposed a safety plan under which the boys would be returned to his home and cared for, in his absence, by his

---

[7] At about this same time the Resource Center family worker who visited the home weekly reported to her supervisor over the course of several weeks that she was concerned about hygiene in the home and the boys' physical health and well-being, and she reported having urged Christopher to obtain medical treatment for the boys.

pregnant 17-year-old sister. OCS had serious reservations about this plan, as did the superior court. The court found that Christopher's plan — expecting a teenager to care for herself as well as six-year-old, four-year-old, and two-year-old children, all while recovering from childbirth and caring for her own first-born child — was unrealistic.

OCS was troubled by the pattern into which Christopher and Therese appeared to have fallen: OCS removed their children, the parents worked on a case plan, and OCS returned the children only to have to remove them again. OCS arranged for Christopher and Therese to participate in psychological testing. Kevin Lankford, a psychological associate, examined them in August 2010, prepared reports for OCS, and testified at the termination trial as an expert in administering psychological evaluations and making treatment recommendations. According to Lankford, Christopher had borderline verbal comprehension, weakness in his working memory, and poor insight and judgment. Lankford recommended that Christopher complete another parenting class and noted that Christopher would benefit from having material repeatedly modeled for him. He also recommended that Christopher receive counseling to improve his social skills.

Lankford reported that Therese had borderline intellectual ability, demonstrated poor insight and judgment, and had difficulty controlling her anger. He identified important strategies for counselors working with Therese: repetition of tasks and breaking tasks into simple, concrete steps.[8]

As a result of the evaluations, OCS determined that both parents required parenting training with a more "hands-on" approach; its revised approach emphasized the

---

[8] Another reason OCS asked Lankford to evaluate Therese was that she was having difficulties in her substance abuse treatment program at the Women and Children's Center. Following Lankford's report OCS worked with the Center to extend Therese's stay there and to design a treatment program specifically tailored to her needs.

demonstration of parenting skills with follow-up practice by the parents, as opposed to written instruction and workbooks. OCS coordinated with staff at the Resource Center to implement this more hands-on program. Heminger described the new approach as "super-repetitive, super-concrete . . . hands on, every step of the way." He described Lankford's evaluations as the "keystone" of OCS's renewed efforts.

In September 2010 the superior court held a placement review hearing. The parents requested that Chris be placed with Therese at the Women and Children's Center, where she was participating in residential treatment, and that Cal, Eric, and Zander be returned to Christopher. The superior court directed that Chris be placed with Therese but denied the request as to the older boys. The court noted that Christopher now had unfettered access to health care, but it found that it was his failure to follow through with health care, not a lack of access, that had caused the children's removal. The superior court found that Christopher had "made no showing at all that he understands and is capable of recognizing [the children's] need for care, nor has he presented any evidence indicating an ability to follow through on recognized needs if medical issues arise in the future." The superior court acknowledged that Christopher's home was now clean, but it found that returning the children would place them "in imminent danger of harm." The court found that Christopher had not demonstrated an ability to care for the children; specifically, the court noted that Christopher had not fed them properly in the past, even though OCS had provided food, that he had declined OCS's offer of daycare assistance, and that parenting classes had been ineffective. The court found that Christopher had not shown "how he would ensure that the children will be fed and bathed and kept clean with fresh diapers and clothes. He has not provided any evidence that indicates he has a plan for prioritizing his tasks."

Chris's placement with Therese did not last. Therese successfully completed treatment in October 2010 and moved with Chris into a shelter, but the baby fell off of a

bed and hurt his head. Therese felt overburdened and asked that Chris be returned to foster care. Chris went back to his foster home in Fairbanks, and Therese moved back in with Christopher.

Over the months that followed, Resource Center staff members worked with Christopher and Therese intensively. A family services worker met with them every week. Sessions consisted of an hour of parenting instruction, during which the worker explained and modeled outcomes and behaviors the parents would have to demonstrate before reuniting with their children, followed by supervised visits of one or two hours with the children, during which the parents were expected to practice what had just been modeled for them. Instruction focused mainly on improving parental supervision and disciplinary methods and addressing the parents' inappropriate reliance on food to control the children's behavior. Sessions were conducted primarily at the Resource Center's visitation room but sometimes moved off-site for visits to restaurants, a park, a fair, and a fiddlers' festival, and for activities such as bowling and miniature golf.

OCS was hoping to place Chris with Therese once again for a trial home visit if she continued to respond well to services. OCS was hoping to return the other boys to the home as well, in time. To further assist the parents in meeting these goals, OCS referred them both for drug testing and counseling through Tanana Chiefs Conference (TCC). OCS referred Therese to Ralph Perdue Center for substance abuse after-care services, which she began in November 2010. OCS encouraged the parents' continuing participation in the Resource Center's parenting services, and it began trial weekend-long visits for Chris at the family home. It also attempted, unsuccessfully, to arrange for the parents to visit the older children at their foster home in Nenana.[9]

---

[9]    OCS arranged several times to drive the parents to Nenana for visits that were to last several hours. But none of these visits took place because each time the
(continued...)

The parents began counseling at TCC, but after several sessions the counselor's scheduling problems interfered and the sessions ended. Therese participated in the after-care program at Ralph Perdue until January 11, 2011, when she relapsed and was discharged. She later admitted to having relapsed a number of times during the program. When OCS learned of her latest relapse it decided not to attempt any further placements with Christopher and Therese for the foreseeable future.

In early February 2011 Eric — then seven years old — was removed from Innis and Olech's home and placed in therapeutic foster care in Fairbanks, following a report that he had choked the foster parents' five-year-old daughter. His therapeutic home is a potential adoptive placement for him.

In March 2011 OCS changed Chris's foster placement, moving him from his foster home in Fairbanks and placing him with Innis and Olech in Nenana. The move was intended to unite permanently three of the siblings, Cal, Zander, and Chris; by this time OCS anticipated that the boys would not be reunited with their parents but would instead be adopted by Innis and Olech. Later that month, the superior court approved a change in the permanency goals of these three boys, along with Eric, still in a separate placement in Fairbanks, from reunification to adoption.

In April 2011 Therese relapsed yet again. She and Christopher were smoking and drinking together when they got into an argument that turned physical. As a result Therese was charged with assault; she pleaded guilty to a reduced charge of harassment and was ordered to serve 15 days for having violated probation conditions related to her 2010 assault convictions. Christopher did not seek help for Therese or otherwise help her reconnect with treatment.

---

[9](...continued)
parents overslept and their social worker was unable to contact them. Other visits arranged for Fairbanks were more successful.

OCS again referred Therese for a substance abuse assessment and treatment, this time for wrap-around services at Ralph Perdue. An assessment was scheduled for mid-July, but Therese missed the appointment; instead she went to Shungnak to attend a funeral, not notifying OCS of her plans. While in Shungnak, Therese, who had recently become pregnant again, consumed gallons of homebrew during several bouts of drinking and became involved in a family altercation during which she was repeatedly kicked in her stomach. She did not seek medical care but instead remained in the village, continuing to drink for several days before being medivaced to Kotzebue, where she was hospitalized for a week.

In late August 2011 Therese completed her assessment at Ralph Perdue, which recommended that she "enter and complete a Long Term Clinically Managed Medium Intensity Residential Treatment Facility." Therese denied to the assessor that she had problems with alcohol or marijuana; however, she tested positive for cannabis and opiates.[10] She explained that it was the loss of her children that had caused her most recent relapse. She told the assessor that she did not want to participate in treatment but that OCS was requiring her to do so. According to the assessor, Therese did not recognize that her use of alcohol and drugs caused problems in her life, and she did not understand why OCS was involved with her family.

That same month OCS referred Christopher, too, to Ralph Perdue for an assessment. Christopher told the assessor that his problem was OCS's custody of his children. He said that he was not troubled by his use of mood-altering substances and that he did not identify his marijuana use as a problem, despite his daily use of it and possible exposure to his children. He reported that two years earlier he had abstained for 18

---

[10]     According to a stipulation of facts filed with the superior court, the opiates result was likely due to morphine Therese was given in the hospital.

months but he had begun using again because of OCS's involvement in his life, and he had been unable to quit since then despite three attempts. The assessor recommended that Christopher participate in outpatient treatment.

In September 2011 OCS filed a petition to terminate Christopher's and Therese's parental rights to Eric, Cal, Zander, and Chris. Therese began residential treatment that month at the Women and Children's Center. In November 2011 Christopher began an outpatient treatment program through Ralph Perdue. In December 2011, while both parents were in treatment, they were married.

The parents' attendance at parenting sessions at the Resource Center lagged toward the end of 2011, and late in the year they stopped participating altogether. As a result, weekly visits with the children were moved from the Resource Center to OCS's office. Both parents completed their substance abuse treatment programs in January 2012. The next month their sixth child, Mitchell, was born. OCS assumed emergency custody of the baby and placed him in foster care with Eric. The parents had daily visits with Mitchell, held jointly with their weekly visits with the older boys on the days those visits were held.

In late March 2012 the superior court began a trial on OCS's petition to terminate Christopher's and Therese's parental rights to Eric, Cal, Zander, and Chris. After three days of testimony, Christopher's mother became ill and had to be hospitalized in Anchorage, and the court continued the proceedings in order to accommodate the family's schedule.

In April 2012, during the continuance, airport police stopped the couple on their way to Kobuk, a dry village. Police found a 750-milliliter bottle of whiskey in Therese's bag and three 750-milliliter bottles of whiskey taped to Christopher's body. Therese told the officer that they were taking the alcohol to her mother in Kobuk. When the termination trial resumed in May, Katharina Johnson of Fairbanks Native Association,

-14- **6790**

who had earlier performed assessments on both Therese and Christopher, testified as an expert in drug and alcohol assessment and the treatment of substance abuse. She testified that the smuggling incident demonstrated a significant reversal in Therese's path toward sobriety, and that Therese now required "more intense treatment, something that was longer term by — a lot longer than six months." Also during the continuance Christopher tested positive for cannabis.

The termination trial concluded on June 1, 2012. In September 2012 the superior court issued a highly detailed and thorough written order terminating Christopher's and Therese's parental rights to the four boys. Both parents appeal. Christopher and Therese each challenge the superior court's findings that (1) they did not remedy conduct or conditions under their control that placed the children in danger; (2) OCS made active efforts to prevent the breakup of the Indian family; (3) their continued custody of the children would likely result in the children suffering serious emotional or physical harm; and (4) termination of their parental rights is in the children's best interests.

## III. STANDARD OF REVIEW

In Child In Need of Aid (CINA) cases, we review the superior court's factual findings for clear error and its legal determinations de novo.[11] Factual findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that the superior court's decision was mistaken.[12] Conflicting evidence is generally not sufficient to overturn the

---

[11] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011)).

[12] *Id.* (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of*
(continued...)

superior court's factual findings, and we will not reweigh evidence when the record provides clear support for the superior court's ruling.[13] Whether a parent has remedied conduct or conditions that endanger a child, whether the child will likely suffer harm if returned to the parent's custody, and whether termination of the parent's parental rights is in the child's best interests are factual determinations.[14] Whether OCS made active efforts to prevent the breakup of the family as required by ICWA is a mixed question of fact and law.[15] Whether the superior court's findings satisfy the requirements of ICWA, state CINA statutes, and Alaska court rules is a legal question.[16]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding That Christopher And Therese Failed To Timely Remedy Conduct Or Conditions That Endangered Their Children.

Alaska Statute 47.10.088(a)(2) requires a court to find, by clear and convincing evidence, that a parent has failed to timely remedy conduct or conditions that endanger the parent's children before the court may terminate parental rights. The

---

[12](...continued) *Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[13] *Id.* at 428 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[14] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (citing *Barbara P.*, 234 P.3d at 1253 (remedy of conduct and conditions; likelihood of harm if returned to parent); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009) (child's best interests)).

[15] *Id.* (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

[16] *Dale H.*, 235 P.3d at 210 (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

superior court found that this requirement was met here. It began its analysis by considering the length of time the children had been in state custody — five years for Cal (age six at the time of trial), over two years for Eric and Zander (ages eight and four), and since birth for Chris (age two). The court then discussed Therese's substance abuse before considering issues that affected the parents jointly and those relating to Christopher in particular. The court was most concerned that in the nearly two-year period following the children's removal, neither parent had developed basic parenting skills.

The superior court relied on the testimony of Resource Center workers Amber Thompson and Meghan Maroney, who testified that Christopher and Therese had made no appreciable progress despite over a year of parenting sessions in which proper techniques for supervision and discipline were repeatedly modeled and demonstrated; the instructors could never move beyond very basic parenting skills.[17] Thompson, Maroney, and Heminger described visits during which neither parent acted protectively when the boys darted across a street, the parents watched movies and ignored the boys' needs, or the parents focused on the baby, Mitchell, to the extent that the other boys gave up trying to interact with them. Maroney testified that the parents used food as a substitute for verbal communication, and that she was very concerned about the parents' lack of structure and their failure to provide consistent discipline and guidance. She testified that the boys reacted to transitions to and from visits with their parents with anxiety, which they dealt with by throwing age-inappropriate tantrums, and that while she would have expected these behaviors to dissipate over time, they did not. She, Thompson, and Heminger all testified that while the parents had demonstrated some positive behaviors,

---

[17]     Thompson testified as a lay witness; Maroney was qualified as an expert in parenting education to mitigate safety threats to children.

their overall progress had been inconsistent and their parenting abilities in 2012 were no better than they had been in 2010, when the children were removed.

In addition, the superior court found that Therese's ability to parent her children had been substantially impaired by her substance abuse, which, along with the physical violence that sometimes resulted, placed her children at substantial risk of both physical and mental harm. The court found that Therese had not remedied her addictive behavior. It based these findings on Therese's long history of substance abuse and related violence, her numerous failed attempts at treatment, her relapses following completion of treatment programs, her short current period of sobriety, and expert witness Johnson's testimony that Therese currently needed to complete another, longer, course of treatment. The superior court found that Therese's proclivity toward violence when intoxicated and her potential to relapse would endanger the children if they were returned to her care.

In finding that the children would be at risk from the combined parenting of Therese and Christopher, the superior court questioned Christopher's ability to support Therese in her sobriety. The court found that Christopher "has consistently demonstrated that he will help to hide [Therese's] relapses rather than seek help for her, thus placing the boys at risk if they are in their parents' care during a relapse." This finding addresses Christopher's testimony that he would ask Therese to leave if she were to relapse and endanger the children. He testified that he had never asked her to leave in the past: "I didn't really. I'd said I would, but I never did." His explanation as to why he had never done so provides little support for a claim that he would behave differently in the future: "It's just a big emotional thing that I have for her and I love her and [we have] been through a lot in the past, so." The superior court ultimately concluded that Christopher "is not a sober support for [Therese]."

The superior court was also concerned because Christopher, even after completing treatment, tested positive for cannabis during the continuance in the

-18-                                    **6790**

termination trial, saw no reason to stop using the drug, and failed to appreciate that his use might affect his children, especially if it were to coincide with a relapse by Therese.

Christopher disputes the superior court's finding about his own failure to remedy conduct that endangered the boys, arguing that his home life was more stable in 2012 than it had been in 2010 and justified the immediate return of his children. But this argument does not address the basis for the superior court's finding, which is that Christopher has not provided evidence that he is capable of parenting the boys safely. In addressing this aspect of the superior court's decision, Christopher simply dismisses the testimony of expert and lay witnesses about his parenting abilities as "nebular accusations and petty criticisms." This is insufficient to demonstrate error in the superior court's finding of fact.

Having reviewed the record, we conclude that the superior court's finding that Christopher failed to remedy dangerous conduct or conditions is supported by clear and convincing evidence, and we therefore affirm the finding.[18]

Therese argues that the same finding is erroneous as to her because she no longer has a problem with alcohol or drugs, because she was able to articulate at trial appropriate parenting skills that she had learned through the Resource Center program, and because the superior court's finding that the children were in need of aid was not based on her neglect of them.

---

[18] The superior court did not clearly err by failing to accept Christopher's assertion that Heminger and the Resource Center staff members who were "judging" him were unfamiliar with Native cultural ways. Heminger was qualified, without objection, as an expert in providing social services to clients of Alaska Native descent, and Maroney testified that roughly half of the Resource Center's clients are Alaska Native and that the Center regularly incorporates parents' cultural values into its family contact programs.

As to her first point, Therese asserts that the superior court did not adequately consider positive factors in her life, citing her more than eight months of sobriety (including her four months in residential treatment), her testimony that she no longer desires alcohol or drugs, her understanding that her anger issues are related to her substance abuse issues, the availability of other family members and friends to provide her with sobriety support, the fact that she and Christopher were married and living in appropriate housing, and the fact that she had not engaged in domestic violence or been arrested for more than a year.

The superior court did consider Therese's period of sobriety, finding it "encouraging" and entitled to some weight; but it also found that "in light of her long history of alcohol addiction and repeated failed treatment attempts over the past five years, four and one-half months of sobriety outside of residential treatment is insufficient to establish a timely remediation of [Therese's] addiction." The superior court's conclusion based on this evidence is in line with our prior decisions. For example, in *Sherry R.*[19] we rejected a mother's argument that her sobriety for a year before her termination trial demonstrated that she had remedied the conduct that endangered her children. We noted that the mother's sobriety was "a relatively new phenomenon in her life. She has struggled with substance abuse and relapsed after treatment a number of times. Additionally, although she recognizes that she has had problems with alcohol, it

---

[19]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896 (Alaska 2003).

is unclear the degree to which she accepts her problem."[20] The facts of the present case do not differ significantly from those in *Sherry R.*[21]

The evidence Therese cites is indeed positive, but it is not enough to show that the superior court clearly erred in finding that she had not remedied her substance abuse issues by the time of trial, particularly given expert witness Johnson's unrebutted testimony that Therese is still in need of additional and lengthy substance abuse treatment, a need that she does not acknowledge.

As to her second point, Therese's ability to describe appropriate parenting skills at trial does not refute the testimony of Heminger and Resource Center workers that in the preceding year she had proven unable to consistently provide her children with safe parenting, even in the controlled environment of supervised visitations.

Finally, Therese argues that the superior court erred because it found that she failed to remedy inadequacies in her parenting skills but had not found that those same

---

[20] *Id.* at 902.

[21] *See also Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1112-13 (Alaska 2010) (affirming finding that nine-month period of sobriety following years of alcohol abuse was insufficient to demonstrate timely remedying of conduct); *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1261 (Alaska 2010) (nearly six-month period of sobriety); *Natalie D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1239, 2006 WL 438651 at *6 (Alaska, Feb. 22, 2006) (four-month period of sobriety); *Kira I. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1195, 2004 WL 2830860 at *4 (Alaska, Dec. 10, 2004) (six-month period of sobriety); *Ruth S. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1180, 2004 WL 1950244 at *4, *6 (Alaska, Sept. 1, 2004) (five-month period of sobriety); *Jerry C. v. State, Dept. of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1137, 2003 WL 21564518 at *4 (Alaska, July 9, 2003) (six-month period of sobriety); *Craig F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1132, 2003 WL 21117676 at *6 (Alaska, May 14, 2003) (seven-month period of sobriety).

inadequacies had caused her to neglect the children in the past. We find no merit to this argument. The superior court found that the children had suffered serious neglect at Christopher's hands because of his inadequate parenting skills while Therese was not in the home. The court found that Therese exhibited the same inadequacies. The court found that because neither parent had improved their parenting skills following the children's removal, the children would be at risk of suffering the same level of neglect if they were returned to the care of either or both parents. Given these findings and the evidence supporting them, it was not error for the superior court to conclude that Therese's failure to develop and demonstrate safe parenting skills constituted a failure to remedy conduct or conditions that would endanger the children if they were to be placed in her care.[22]

Having reviewed the record, we conclude that the superior court's finding on this issue as to Therese, like its finding as to Christopher, was supported by clear and convincing evidence, and we therefore affirm it.

B.  **The Superior Court Did Not Err In Determining That OCS Made Active Efforts To Provide Services And Programs To Prevent The Breakup Of The Indian Family.**

25 U.S.C. §1912(d) and Alaska Child in Need of Aid Rule 18(c)(2) require a court to find by clear and convincing evidence that the state made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family before the court may terminate a parent's parental rights to an Indian child. Courts review OCS's reunification efforts on a case-by-case basis because "no pat formula exists for distinguishing between active and passive

---

[22]  *Cf. Jeff A.C., Jr. v. State*, 117 P.3d 697, 703 (Alaska 2005) (conduct or conditions relied upon by a court in terminating a parent's rights need not be the same as the conduct or conditions that formed the basis for the child's CINA adjudication).

efforts."[23]  Generally, active efforts require a social worker to take the parent through the steps of the reunification case plan, rather than simply devising a plan and requiring the parent to develop his or her own resources to meet it.[24]  In determining whether active efforts have been made, a court may consider all services provided during the family's involvement with OCS; it need not focus on a distinct period of time.[25]  In addition, "a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."[26]

The superior court devoted nearly ten pages of its decision to the efforts OCS made to reunify this family.  The court stated that before March 2010 OCS focused its efforts "primarily" on Therese's substance abuse issues, but that it also offered Christopher domestic violence services through LEAP, a substance abuse evaluation, and urinalysis testing.  The superior court found that OCS did not make "active efforts" to assist the parents in developing parenting skills before 2010, but starting in 2010 OCS made "extensive" efforts in this area.[27]  Christopher characterizes the court's statements

---

[23]    *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 n.12 (Alaska 1997)) (internal quotation marks omitted).

[24]    *Lucy J.*, 244 P.3d at 1114 (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[25]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008) (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[26]    *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001) (citing *A.M.*, 945 P.2d at 306).

[27]    The superior court found that by July 2010 OCS had made the following efforts intended to avoid having to remove the children from the home:

(continued...)

as a finding that before March 2010, OCS made "no effort whatsoever" to assist him. He argues that this "glaring finding," combined with OCS's purported lack of initiative or assistance prior to the July 2010 removal, casts doubt on OCS's efforts to support him throughout the duration of the case. We reject these assertions as unsupported by the record.

Christopher also argues that OCS's efforts after the children's removal in July 2010 were inadequate because (1) OCS took too long in helping Christopher obtain the children's BIA cards to allow them to receive medical care at Chief Andrew Isaac Health Center; (2) OCS did not follow through on Lankford's recommendation that Christopher receive hands-on parenting training; (3) services offered by the Resource Center were not sensitive to Christopher's cultural background; (4) Christopher had very little contact with his Resource Center worker; (5) Heminger did not regularly update Christopher's case plan or clarify his concerns to Christopher; (6) Heminger did not visit Christopher's home after January 2011; and (7) Heminger did not make enough effort to

---

[27](...continued)

> OCS supported [Therese's] entry into the Women's and Children's treatment program so [Therese] could eventually rejoin the family as a sober care provider. It offered childcare to [Christopher]. It offered [urinalysis testing] to [Christopher] and [Therese]. It provided intensive parenting education classes through [the Resource Center]. It provided parenting classes in 2007 through the STAR program. It has provided counseling through Fairbanks Community Health and TCC. It provided LEAP classes for [Christopher]. It offered transportation services. It assisted with application for public assistance. It assisted with enrolling the school-age children in school. And it assisted the family with the provision of food boxes.

"enforce" telephonic visits or in-person visits with the children when they were in foster care in Nenana.

We address these arguments in order and find no merit in any of them. First, the superior court found that OCS "bore some fault for taking too long in obtaining the BIA cards," but the court concluded that OCS's lack of action was of little import both because Christopher could have obtained medical care for the children at the facility's emergency room, and because "the children's removal in July 2010 was caused, not by lack of access to BIA-provided health care, but by [Christopher's] failure to follow through on the medical care for his children."[28]

Second, the superior court found that OCS and the Resource Center modified their techniques of parenting training to implement Lankford's recommendations as to what would most benefit Therese and Christopher. The court specifically found that "the parents' complaint that OCS did not implement the hands-on training is not supported by the evidence." Testimony by Heminger and Resource Center workers supports this finding.

Third, the superior court found that the parenting training did not fail due to a lack of cultural sensitivity. Instead, the court found that the Resource Center

> was willing to incorporate important cultural values into the program and the supervised visits, but the parents failed to identify their cultural needs other than bringing important cultural foods to a few visits to share with the boys. Parental input was essential for [the Resource Center] to incorporate cultural needs into its program for [the parents], but the parents were not forthcoming with what they felt they needed.

---

[28] Social worker Heminger testified that at the time he was helping Christopher obtain the BIA cards he was unaware of their significance in the children's ability to access free health care at Chief Andrew Isaac.

This finding was supported by the testimony of Resource Center workers, who testified that they incorporated Native cultural practices into their parenting sessions to the extent Christopher and Therese were willing to identify the practices that were important to them. Christopher asserts in his brief that a Native caseworker was more helpful than a later non-Native caseworker who, he asserts, was "not at all familiar with Native culture." In the cited testimony, however, Christopher's only specific complaint was about the two caseworkers' different styles of teaching, contending that he did better with a hands-on approach; but the trial court found that OCS understood the parents' special educational needs and made substantial efforts to accommodate them.

Fourth, Christopher had the opportunity to meet with his Resource Center worker for an hour each week before visiting with his children. Resource Center workers testified that Christopher was not as involved as he could have been in their sessions, and that his attendance fell off over time. The superior court made findings consistent with this testimony.

Fifth, while Heminger arguably did not update the case plan as often as he should have, this was due in part to the fact that Christopher's needs did not change over the course of the case. And Heminger testified that he regularly discussed with the parents his expectations and goals for them. The superior court found Heminger's testimony on this point credible, and it noted that failure to complete paperwork does not equate to a failure to provide active efforts.

Sixth, Heminger did not inspect Christopher's home after January 2011 because after that time the conditions in the home did not pose a threat to the children; OCS was retaining custody due to the parents' lack of parenting ability. The court noted this in its termination order.

Finally, Heminger testified that telephone visits were not successful because the parents often did not answer their phones, and the superior court found this to be the

reason. Both Christopher and Heminger testified, and the superior court found, that the attempted in-person visits to Nenana did not occur because the parents did not make themselves available. After four failed attempts, the parents did not accept Heminger's offer to try again.

In addition to raising several of these same unavailing arguments, Therese argues that OCS's efforts were inadequate because they did not constitute "appropriately tailored services [offered] in a timely fashion." She bases this assertion on OCS's focus on her substance abuse issues during the first several years of the case, and on its failure to determine before 2010 that she had significant cognitive deficits that would benefit from a special approach to treatment and the provision of services.

The superior court listed the efforts that OCS had made in providing services to Therese over the years, including arranging and paying for repeated substance abuse assessments and residential treatment programs and providing transportation assistance both before and after 2010. The court found that OCS's focus on Therese's substance abuse problems from 2007 to 2010 was appropriate. From 2010 onward, the court noted that OCS offered Therese a psychological evaluation, modeling-based hands-on parenting education, hands-on substance abuse treatment, grief counseling (which Therese refused), vocational rehabilitation services (which Therese also refused), housing assistance, transitional housing, couple's counseling, and trial home visits.

As we have noted, OCS's duty to make active efforts for a family does not require perfect efforts.[29] In *Pravat P.* we observed that "[o]ur concern is not with whether the State's efforts were ideal, but with whether they crossed the threshold between passive

---

[29]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

and active efforts."[30]  Here, as in *Pravat P.*, "the multiple actions taken by OCS and summarized by the superior court, viewed as a whole, decisively crossed the threshold into active efforts. This is certainly not a case in which a plan was drawn up and the parent was left to his own devices in carrying it out."[31]

The record provides sufficient evidentiary support for the superior court's finding that OCS made active but unsuccessful efforts to reunify Christopher and Therese with their children.  The finding is affirmed as to both parents.

**C.     The Superior Court Did Not Err In Finding That The Children Would Likely Suffer Serious Emotional Or Physical Harm If Returned To Christopher's Or Therese's Custody.**

25 U.S.C. § 1912(f) requires a court to find, beyond a reasonable doubt, that a parent's continued custody of an Indian child will likely result in serious emotional or physical damage to the child before the court may terminate parental rights.  Proof that the parent's custody is likely to cause the child serious harm requires a showing both of harmful conduct and that the harmful conduct is not likely to change.[32]  This proof must include qualified expert testimony based upon the particular facts and issues of the case.[33]

The superior court found beyond a reasonable doubt that returning the children to the care of Christopher or Therese would cause the children serious emotional

---

[30]     *Id.* (citing *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

[31]     *Id.* (citation omitted).

[32]     *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009) (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

[33]     *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002) (citing 25 U.S.C. § 1912(f) (2000); *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1218 (Alaska 2001)).

or physical harm. The court discussed the severe level of neglect that Cal, Zander, and Chris were exposed to before their removal from the family home in July 2010. Citing the testimony of expert witnesses Heminger, Maroney, and Lankford and lay witness Thompson, the court found that despite the Resource Center's year-long work with both parents, there was "*no* progress on the part of *either* parent in obtaining parenting skills," which "establishes beyond a reasonable doubt that if placed back in their home, the children will suffer similar neglect." (Emphasis in original.)

Relying on Maroney's testimony, the court found that during visits the children would throw age-inappropriate tantrums to gain their parents' attention "because that is the only skill that works to obtain parental attention. And then, when attention is obtained, the children are calmed with food to the point of illness." The superior court found credible Heminger's testimony that after Mitchell was born the parents focused their attention on him so completely that Eric had "given up" trying to gain his parents' attention during their supervised visits. The court found credible Heminger's and Maroney's testimony that, as late as April 2012, both parents continued to place their own needs before those of their children. The superior court cited expert witness Lankford's testimony that Christopher's failure to develop parenting skills since his evaluation meant that there was "an increased likelihood of neglect if the children are [placed] in his care." The court also cited Lankford's testimony that Therese would be unable to safely parent the children if she were not sober, and that she was prone to violence when intoxicated. The court went on to find that her present period of sobriety was "too short to ensure lasting sobriety has been achieved." Considering this evidence in the aggregate, the superior court found that neither Christopher nor Therese has "the skills necessary to be safe parents," that their conduct was likely to cause harm to the children, and that neither parent was likely to change their harmful conduct in a reasonable time. The superior court found beyond a reasonable doubt that the parents were unlikely to improve their

parenting skills in a reasonable time and that the children would suffer serious emotional and physical harm if they were returned to their parents' custody.

Christopher and Therese raise separate challenges to this finding. Christopher argues that the finding is erroneous because "[t]he weight of the evidence shows that Christopher has remedied the problems which caused the children's removal." The evidence he cites is scant, consisting of a statement by Maroney that she did not think that the children would suffer substantial physical harm if placed with Christopher,[34] a statement by a witness qualified as an expert in midwifery and neonatal care who testified at Mitchell's temporary custody hearing that she was not concerned about Therese's ability to care for her new baby,[35] and Lankford's initial focus on Therese's conduct when asked about the likelihood of harm if the children were returned to their parents' care. This evidence does little to demonstrate that Christopher remedied the conditions that had caused his children harm while in his care, and it conflicts with abundant testimony cited by the superior court that Christopher had not demonstrated an ability to safely care for his children.

Finally, Christopher asserts that the superior court improperly conflated his conduct with Therese's. He cites two statements in the superior court's decision that he asserts demonstrate the impropriety of the court's analysis. The first statement begins "[t]he evidence, taken in the aggregate, establishes . . . ." As the State correctly points out, "aggregate" in this context refers to the superior court's aggregating the testimony of lay and expert witnesses about each parent's conduct; it does not indicate that the

---

[34]     Christopher does not acknowledge Maroney's testimony that she "would be very concerned about *emotional* impacts on — on the children" if they were returned to their parents' care.  (Emphasis added).

[35]     This testimony was incorporated by the superior court into the termination trial record.

superior court improperly conflated Christopher's behavior with Therese's behavior. The second statement Christopher relies on is that "[t]he court *reluctantly* concludes that [Christopher and Therese] do not presently have the skills necessary to be safe parents."[36] We find nothing improper about this statement and do not interpret it to indicate that the superior court conflated the two parents' conduct. In addition, as the State points out, given that Christopher and Therese were recently married and want to raise their children together, it cannot have been improper for the superior court to consider dangers presented to the children by a household headed jointly by them both.

Therese argues that the superior court's finding is erroneous because she has recently made progress in ordering her life, having remained sober for over eight months (four months of which were in a residential treatment program) and not having been involved in domestic violence for a year. Therese's argument is essentially the same as her argument that the superior court erred in finding that she failed to remedy conduct and conditions that endanger the children. The difference is that the present finding must be supported by evidence beyond a reasonable doubt, including testimony of one or more expert witnesses.[37] Our review of the record indicates no error on the superior court's part in reaching the same conclusion under this more exacting standard.[38] Besides, the court's determination that the children would suffer serious harm if returned to Therese's care is independently supported by the court's finding that she had not acquired the basic skills necessary to safely parent her children.

---

[36]     Emphasis Christopher's.

[37]     *See E.A. v. State*, 46 P.3d at 991.

[38]     The superior court's finding was supported by testimony of expert witnesses Heminger, Maroney, Lankford, and Johnson.

We thus find adequate support in the record for the superior court's finding, beyond a reasonable doubt, that the children will likely suffer serious emotional or physical harm if returned to the custody of Christopher or Therese, and the finding is affirmed.

**D.** **The Superior Court Did Not Err In Finding That Termination Of Christopher's Parental Rights Was In The Best Interests of Eric, Cal, Zander, And Chris.**

Before a court may terminate parental rights, AS 47.10.088(c) requires it to consider the best interests of the child, and CINA Rule 18(c)(3) requires it to find, by a preponderance of the evidence, that termination of parental rights is in the child's best interests. The superior court found by a preponderance of the evidence that termination of Christopher's and Therese's parental rights would serve the best interests of each of the four boys. The superior court examined each child's situation separately. It began by noting Cal's lengthy history in state custody, his repeated removals from his parents' home, and the positive relationship he had developed with his foster parents. The court noted that Cal has difficulty understanding where and to whom he belongs. The superior court next discussed Zander's special educational needs, his difficulty in transitioning after visits with Christopher and Therese, and testimony that he was doing well in his foster parents' care. The court noted that Zander has lived half his life outside his parents' home. As for Chris, the court noted that he receives "his foster parents' 'total attention' from the time he wakes until he goes to bed." The court noted that he has lived his entire life outside his parents' care. Eric, the superior court observed, was placed in therapeutic foster care because of inappropriate conduct toward another child following his removal from Christopher and Therese, and he has spent the last two years in state custody. The court noted that all of the boys appear to have learning disabilities and developmental delays, and it found that they all, "especially two year old [Chris], need

permanency." The superior court found that all of the boys "need parents who can attend to [their] special needs," and it found that because Christopher and Therese had not "acquired the basic parenting skills necessary to care for their children's physical and medical needs, it is unlikely that the parents will be able to care for the presently-identified special needs of the boys let alone recognize special issues that may arise in the future."

These findings are supported by the testimony of Maroney, who expressed "grave concerns" about the parents' apparent lack of motivation "to eliminate or mitigate at least some of those safety risks that were present before." Maroney testified that each of the boys has needs that "are immense in terms of needing very routine structure and consistency in their lives in order to feel safe." She stressed that children who miss attachment opportunities early in life require a great deal of work in order to rebuild trusting, secure relationships and to form attachments, not only to their childhood caregivers but also as they grow into adults and develop their own intimate relationships. She concluded that these children "are going to need incredible amounts of consistency and safety throughout the remainder of their childhood in order to regain healthy attachments . . . that were lost early on in their childhood." She was concerned that Christopher and Therese did not have the ability to provide the necessary consistency and to eliminate safety risks in their home.

Christopher argues that the superior court's finding is erroneous because he loves the boys, shares a bond with them, and wants to care for them. He argues that if Cal, Zander, and Chris are adopted by Innis and Olech the boys will lose contact with him, Therese, and Eric. He asserts, without elaboration, that the boys' best interests require that they maintain family and tribal contact, have a Native male role model, and learn Native culture from Christopher.

Therese argues that the finding is erroneous because insufficient evidence was presented regarding the children's specific needs and because the superior court failed to consider the children's cultural needs.

Christopher's and Therese's arguments do not adequately address the factors relied upon by the superior court in making its finding and are thus not sufficient to rebut that finding. Besides, the parents' assertions about the children's cultural needs are relevant to placement, not termination. Challenges to placement decisions, including challenges based on cultural concerns, are not properly raised in a termination proceeding.[39]

The superior court's finding, by a preponderance of the evidence, that termination of Christopher's and Therese's parental rights is in the best interests of these four children is adequately supported by the record and is therefore affirmed.

## V. CONCLUSION

For the foregoing reasons we AFFIRM the superior court's order terminating the parental rights of Christopher and Therese to their children Eric, Cal, Zander, and Chris.

---

[39] *See Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1120 (Alaska 2010).