NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SALLY C., | ) |
| | ) Supreme Court Nos. S-18472/18491 |
| Appellant, | ) (Consolidated) |
| | ) |
| v. | ) Superior Court Nos. 3KO-19-00042CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| Appellee. | ) No. 1982 – August 9, 2023 |
| | ) |
| PAUL B., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| Appellee. | ) |
| | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Stephen B. Wallace, Judge.

Appearances: Michael L. Barber, Barber Legal Services, Boston, Massachusetts, for Sally C. Monique Eniero, Anchorage, for Paul B. Laura Hartz, Assistant Public

---

* Entered under Alaska Appellate Rule 214.

Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem. David A. Wilkinson, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, Carney, Borghesan, and Pate, Justices.

## I. INTRODUCTION

The Office of Children's Services (OCS) removed an Indian child from his parents' custody in 2018. Over the next four years, a series of OCS workers provided case planning, remedial services, and visitation; the parents engaged inconsistently. In March 2022 the superior court terminated parental rights. The superior court determined the child was in need of aid based on five different statutory grounds: abandonment, neglect, substance abuse, substantial risk of physical harm, and exposure to domestic violence. The court concluded OCS made active efforts to provide the parents with remedial services designed to reunify the family, but that those efforts were unsuccessful.

Both parents appeal the superior court's determination. They challenge each of the grounds for the superior court's child in need of aid findings and argue that OCS did not make active efforts. Each parent also raises separate due process arguments related to the trial, claiming the superior court violated their rights.

We affirm the superior court's decision to terminate parental rights.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. General timelines; case plans and services offered; the parents' mixed engagement and non-cooperation

Felix is the child of Sally and Paul;[1] he is an Indian child.[2] Following Sally's June 2018 arrest for a domestic violence incident, OCS filed an emergency child in need of aid (CINA) petition and removed then-20-month-old Felix from his parents' care.

After removing Felix from his parents' custody, OCS initially placed Felix in a foster home, then returned him to Sally pursuant to a safety plan. OCS removed Felix again in November 2018 following an incident in which Sally left him unattended in a trailer. OCS subsequently placed Felix with a foster home. He has since remained in out-of-home placement.

The initial OCS caseworker stated that Paul was oppositional and uncooperative with OCS. OCS documented that Paul skipped numerous urinalyses scheduled during June and July of 2018. Paul attended counseling, but after an incident between the parents and clinician, the clinic refused to see Paul again. The initial caseworker referred Paul to a counseling center for an assessment, but Paul showed up too inebriated to participate. According to the initial caseworker, Paul was evasive, essentially making it impossible to complete assessments. The initial caseworker stated both parents were sporadic in taking drug tests. But the initial caseworker testified that Paul's attitude changed as the case progressed. He stated Paul became more

---

[1]     We use pseudonyms to protect the parties' privacy.

[2]     Felix is eligible for enrollment with Sally's Tribe (Tribe), and therefore is an Indian child as defined by the Indian Child Welfare Act (ICWA). 25 U.S.C. § 1903(4) (defining an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

"cooperative" in late 2019. And he stated Sally initially was generally "cooperative," although she would sometimes not follow through on tasks in the case plan.

The initial caseworker created separate case plans with each parent. He created a case plan with Sally in December 2018 and another in November 2019. Sally's case plans outlined several goals and recommendations: Sally would attend parenting classes, abstain from harmful substances, complete drug testing, learn to manage her emotions, and see her clinician at the Kodiak Area Native Association (KANA) for counseling. The 2018 plan stated that OCS would contact KANA to coordinate training, "[c]heck into" a family-focused service provider, call KANA "to find out about" parenting classes, and schedule random urinalyses. OCS's "next steps" in the 2019 plan included sending referrals "as needed."

The initial caseworker created a case plan for Paul in October 2019. The plan required Paul to complete an integrated assessment and a neuropsychological assessment, look for therapy, submit to drug testing, maintain stable employment, and participate in visitation with Felix. The plan stated OCS would make referrals for the assessments and drug testing.

The initial caseworker testified to the efforts he made for both parents. He made referrals for integrated assessments and drug testing. The initial caseworker testified he "would call and make appointments for [the parents] and then call them and let them know when the appointments were," and "follow up" afterward to find out what the parents needed. Most of the initial caseworker's efforts were directed towards Paul: he referred Paul to parenting classes but they "didn't click"; he believed an anger management or batterer's intervention course was offered to Paul, but could not recall whether domestic violence counseling was offered to either parent; he continued to offer Paul random drug testing; and he took Paul to get a driver's license so he could secure employment. The initial caseworker explained he spent more time talking to Paul than any of his other clients.

In December 2019 Sally moved to Anchorage. She did not inform OCS or provide OCS with new contact information. During her absence Sally had little contact with Felix. The initial caseworker testified that Sally did not see Felix for six months.

Sally returned from Anchorage in March 2020. OCS was informed in March that she tested positive for methamphetamine. From June to August 2020, a second OCS caseworker was assigned to the case. The second caseworker traveled to the family's community three times and met with Paul in person one time. The second caseworker found communication with Paul difficult because of his aggression. The second caseworker also created a new case plan for Sally in August, although the case plan was incomplete and did not include "next steps" for either OCS or Sally. The case plan required Sally to comply with drug testing, complete an integrated assessment, secure employment, secure independent housing, and participate in parenting education and other services. The case plan only required OCS to make referrals. Later in August, OCS also created a second case plan for Paul. But as in Sally's case plan, the "next steps" sections for both Paul and OCS were blank. The only action required of OCS was to make referrals and request funding.

In August a third caseworker was briefly assigned to Paul's and Sally's cases. The third caseworker spoke with Paul once and a case plan was signed by a different caseworker. The third caseworker testified she attempted to contact Sally and that Sally arrived at the OCS office and appeared to be under the influence of an intoxicant. Sally refused to sign the case plan until she talked with her attorney.

Later in August a fourth OCS worker was assigned to the parents' cases. The fourth caseworker testified she "case-planned with the parents" and "made referrals." It appears the fourth caseworker did not update the case plans at any time during the remainder of 2020 or 2021, even after the superior court directed OCS to do so. The fourth caseworker testified the parents were "sporadic" in their participation and lacked "follow-through and engagement in their case plan."

The day after an October 2020 in-person visit between the parents and Felix, OCS's ICWA specialist for the Southcentral region — who regularly conducted home visits, including to Felix's foster home — went to Paul's address unannounced. According to the ICWA specialist, Sally was present, the house was in disarray, and there appeared to be used drug paraphernalia — aluminum foil and a burnt spoon with a white substance on it. Around the same time, Sally completed a substance abuse assessment and reported extensive drug use.

The fourth caseworker testified that in 2021, OCS made new drug testing referrals. Paul did not participate. Sally consistently no-showed for drug testing in early 2021. In February the fourth caseworker completed an evaluation of Sally's case plan and noted that no progress had been made on her goals due to lack of participation, failure to engage in drug testing, and sporadic visitation. In July the fourth caseworker referred Sally for a family violence risk assessment and for services recommendations. According to the fourth caseworker the assessor made several recommendations for additional services, and Sally failed to meaningfully follow up. In August Sally took one urinalysis which was positive only for marijuana.

In August the local women's center helped Sally move to Anchorage in order to secure a safer living situation closer to services. OCS referred Sally for drug testing in Anchorage. The fourth caseworker worked with Sally to get an identification photograph and send it to the drug testing facility. The fourth caseworker attempted to contact Sally to set up a meeting, but Sally left an incomplete voicemail and then did not respond to return calls. Sally never attended drug testing in Anchorage. In December Sally moved back to her community. She completed another substance abuse assessment in January 2022 that recommended intensive outpatient treatment.

### 2. Visitation

Through October 2019 Paul had regular, supervised visitation with Felix. The initial caseworker testified Paul seemed "really invested in his relationship with his son," generally had "normal, pretty good" interactions with Felix, and for a period did

a "proper job with visitation." OCS workers testified these visits went "really well," that there was "a lot of positive encouragement" from Paul, and that Paul interacted in "developmentally appropriate" ways with Felix.

In the fall of 2019, OCS coordinated visitation through a contractor that provides family visitation services. According to the initial caseworker, OCS approved unsupervised visits for Paul twice weekly for at least one period of time beginning in late 2019. But the situation deteriorated.

The initial caseworker explained there were problems when Paul and Sally attended visits together. The visitation contractor testified that visits between Sally and Felix were "fairly traumatic" and that Felix was upset and did not want to see his mother. The initial caseworker testified that during visitation Paul was combative and would accuse the foster parents of abuse. An OCS social service associate explained that Paul and Sally made verbal threats against other OCS workers or caused visits to end early due to the parents' "behaviors escalating." The social service associate testified Paul showed Felix inappropriate videos in which Paul yelled at Sally. She further testified that Paul made multiple statements about using a gun to remove Felix during visits. The visitation contractor also noted that Paul had been "incredibly hostile" to staff, brought weapons to the building several times, and was "so aggressive that [the visitation contractor] requested OCS to have a security guard during visitation."

For certain periods the exact timelines for Sally's visitation are difficult to discern. The visitation between Sally and Felix throughout 2019 and 2020 is especially unclear, due in part to OCS's lack of documentation. The second caseworker testified that, according to the OCS database, "the visits [between Sally and Felix before August 2020] either weren't documented or the visits didn't happen." The second caseworker further testified she was not sure when exactly in 2020 in-person visits were restricted due to COVID-19.

For certain periods, the timelines for Paul's visitation are also somewhat unclear. Family contact plans from November and December 2019 stated that visitation for Paul would be unsupervised. The initial caseworker testified that unsupervised visitation for Paul was cancelled after Paul did not cooperate with counseling and substance abuse assessments and refused to submit to drug testing; the visitation plan was switched to supervised. It appears OCS had definitively switched Paul back to supervised visitation by June 2020. OCS offered video visitation for a period during COVID-19, and again beginning in November 2020, but Paul said he could not participate because the only available time was at 9:00 a.m., when "he was getting ready for work."

In October 2020 Paul and Sally had an in-person visit with Felix that OCS ended due to Paul's aggression. Visitation was subsequently switched to Zoom due to safety concerns. According to the fourth caseworker's testimony, as of September 2021 neither Sally nor Paul had seen Felix in person since October 2020.[3] And there is no indication that Paul ever had remote visitation with Felix after October 2020, as Paul did not or could not attend virtual visits, which continued until January 2021. The fourth caseworker testified this lack of contact was "unusual" but was caused by Sally's "behaviors in the office," like "not following the guidelines for visitation" and "arguing." Paul was also not allowed to have in-person visits for similar reasons. This decision was affirmed by the OCS security team in April 2021, when it decided against in-person visitation due primarily to Paul's aggression and threatening behavior. Sally had sporadic attendance at Zoom visits through this period, missing nine visits offered in fall 2021.

---

[3]     Sally sought to re-open evidence to provide evidence that after trial ended, she had been having weekly in-person visits with Felix.

### B. Proceedings

#### 1. Termination petition and trial

In September 2020 OCS filed a petition to terminate both Paul and Sally's parental rights. The petition alleged that Felix remained a child in need of aid on the grounds of abandonment, neglect, substance abuse, substantial risk of physical harm, and exposure to domestic violence.[4] A termination trial was scheduled for January 2021, but was continued first to March 2021, then again to July 2021. Paul requested a further continuance until September 2021, asserting that he would not be able to attend the July trial in person. The superior court denied the request, noting the already-protracted length of the case and the child's interest in permanency. Paul renewed his continuance request on the first day of trial, and the court again denied the continuance, subject to certain accommodations recommended by the State.

The termination trial began in July 2021, was held over the course of 11 days, and ended in March 2022. At trial, five OCS employees testified. A child welfare expert also testified for the State. Several other witnesses testified, including service providers, employees of the Tribe, and the parents.

#### 2. Superior court's findings of fact and conclusions of law

The superior court issued its findings of fact and conclusions of law in June 2022. The court found there was "clear and convincing evidence that each parent continued to use controlled substances" throughout the case. It found that the parents' visitation and contact with Felix had been "sporadic" since December 2019. The court found that Sally's factual representations were not "very credible and gave them little or no weight." It found that, although Sally had initially engaged with OCS, she "subsequently disengaged."

The court also noted that Paul was uncooperative for much of the case. For instance, the court found that Paul "deliberately failed to participate" in an

---

[4] AS 47.10.011(1), (6), (8), (9), and (10).

assessment and that both parents "consistently refused drug testing." The court found that the parents engaged in "inappropriate conduct" during visitations. It further found that, at the time of the trial, neither parent had had "any meaningful contact" with Felix over the previous 18 months, and that this lack of contact was "a function of their individual unwillingness to engage with recommended case plan services or testing."

The superior court concluded that Felix was a child in need of aid under all theories alleged in the petition. It concluded the parents abandoned Felix by showing "a conscious disregard of parental responsibilities toward the child." It reasoned the parents "made only minimal efforts to support and communicate with the child." It found the parents failed "to meaningfully participate at all" in the case plans. The court further determined that their ability to parent was "substantially impaired" by their substance abuse, and that this use "resulted in a substantial risk of harm to the child." The court reasoned that the parents had "wholly failed to participate in any meaningful manner with [substance abuse] treatment or testing." The court also concluded Felix was a child in need of aid because his parents put him at substantial risk of substantial physical harm, there was a substantial risk of mental injury to Felix as a result of exposure to domestic violence, and the parents subjected Felix "to neglect by failing to provide the child with other care and control necessary for the [child's] physical and mental health and development."

The court also found by clear and convincing evidence that OCS had engaged in "active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful." The court found OCS had "continually undertaken case planning for the parents" and noted the initial caseworker's testimony regarding his engagement with the parents and the parent's "non-meaningful cooperation and non-participation." The court determined each of the OCS workers that testified established their efforts to engage with the family but that the parents "have each failed to cooperate" with those efforts. The court noted that Paul's participation was "purposefully contrary [and] non-

cooperative" and that he was "effectively absent from participating in services." The court acknowledged that Sally initially participated in referrals for services but that, in light of her departure, her continued substance abuse, her "deliberate[] fail[ure]" to participate in drug testing, and her "inappropriate interactions" with Felix during visits, she had not "meaningfully engaged" with OCS.

After the conclusion of the trial, Sally filed a motion asking the court to consider additional facts relating to her sobriety and visitation with Felix that became available after the close of evidence. The court denied Sally's motion, reasoning that even if her proffered facts were accepted as true, they would not affect its conclusions. The court emphasized that the trial had already stretched on for months, that Felix had been in out-of-home placement for several years, and that prolonging the case would not serve his best interests.

Both parents appeal.

## III. STANDARD OF REVIEW

We will affirm the superior court's factual findings in a CINA case so long as they are not clearly erroneous.[5] Whether the superior court's factual findings satisfy the requirements of the CINA statutes is a question of law to which we apply our independent judgment.[6]

Whether a child is in need of aid is a mixed question of law and fact.[7] "Whether [OCS] complied with the 'active efforts' requirement . . . is a mixed question

---

[5]     *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 209 (Alaska 2010).

[6]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013).

[7]     *Id.*

of law and fact."[8]  Whether due process rights were violated in a CINA case is a question of law to which we apply our independent judgment.[9]

## IV.    DISCUSSION

### A.    Child In Need Of Aid Findings

Before a court may terminate parental rights, the State must prove by clear and convincing evidence that "the child has been subjected to conduct or conditions described in AS 47.10.011" and that "the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm . . . or mental injury."[10]  The superior court found Felix was a child in need of aid under five AS 47.10.011 grounds.  The parents dispute each of these findings.

"We need not consider each of the grounds alleged if we determine that the record supports any one of the superior court's child in need of aid findings; we may affirm that finding without considering the other grounds."[11]  We therefore affirm the superior court's child in need of aid determinations on one ground for each parent: abandonment as to Paul, and substance abuse as to Sally.

### 1.    There was clear and convincing evidence that Felix was in need of aid because Paul abandoned him.

A child may be found in need of aid if a parent or guardian has abandoned the child as described in AS 47.10.013.[12]  Abandonment occurs when there is "a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision,

---

[8]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

[9]    *Amy S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 440 P.3d 273, 279 (Alaska 2019).

[10]    CINA Rule 18(c).

[11]    *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 265-66 (Alaska 2019).

[12]    AS 47.10.011(1).

considering the child's age and need for care by an adult."[13]  "In considering whether a parent consciously disregarded parental obligations, a court applies 'an objective test to see if actions demonstrate a willful disregard of parental responsibility.' "[14]  To counter an abandonment finding, the parent must show continued interest in the child and make genuine efforts to maintain communication and association.[15]

The superior court found that Felix was a child in need of aid under AS 47.10.011(1).  Although the court's findings referred generally to both parents, we only analyze the abandonment findings pertaining to Paul.  The court noted the parents' "minimal efforts to support and communicate with the child," and their failure, "without justifiable cause, to meaningfully participate at all in all suitable case plans offered or presented and designed to reunite them with their child."

Paul argues the record contained insufficient evidence to establish abandonment.  He asserts that for much of the case he regularly attended in-person visits with Felix.  He contends "the visit notes portray [him] as a caring father who engaged in age-appropriate activities with Felix" and had a period of successful unsupervised visits.  Paul claims that OCS thereafter offered only Zoom visits at a time that was inconvenient for him, that he did not have access to Zoom, and that OCS did not facilitate access.  Paul essentially argues he repeatedly sought in-person visitation and reunification with Felix, but that his efforts were thwarted by OCS.

We conclude there is clear and convincing evidence that Paul abandoned Felix.  Paul's actions in the beginning of the case were consistent with a parent who was committed to the parent-child relationship.  For instance, the initial caseworker

---

[13]    AS 47.10.013(a). The statute provides eight examples of situations that may constitute abandonment.

[14]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012) (quoting *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 775 (Alaska 2012)).

[15]    *David S.*, 270 P.3d at 775.

described Paul as "cooperative," explained he had "pretty normal, pretty good" interactions with Felix, and agreed Paul was "really invested in his relationship with [Felix]." But the situation changed as the case progressed; Paul's final visit with Felix was in October 2020 and there is no indication of further contact or involvement after that point. This absence of contact — while Paul spent more than a year away from Felix — clearly demonstrates abandonment: a disregard of parental obligations and the absence of interest in parenting.

The abandonment finding with respect to Paul thus hinges on the reasons for this prolonged absence of contact. OCS argues that Paul's hostile, aggressive, and inappropriate behaviors caused in-person visits to end, and that Paul then chose not to attend the offered Zoom visits. Paul counters that it was OCS's fault for not facilitating Zoom access or providing a time that worked for him.

OCS has the more persuasive position. It was not clear error to find that Paul's behaviors caused in-person visits to end and necessitated video visitation. There is no evidence that Paul continued to try to maintain contact with Felix after October 2020 or make the Zoom visits work. Moreover, this is a factual dispute about which party was responsible for the lack of visitation; we affirm the superior court's determinations because they are not clearly erroneous. We therefore affirm the abandonment finding with respect to Paul under AS 47.10.011(1) and AS 47.10.013(a).[16] This holding is consistent with our past decisions.[17]

---

[16] *See* AS 47.10.013(a)(2) (parent "made only minimal efforts to support and communicate with the child") and (3) (parent "failed for a period of at least six months to maintain regular visitation with the child").

[17] *See Joy B. v. State, Dep't of Health & Soc. Servs.*, 382 P.3d 1154, 1163-64 (Alaska 2016) (affirming abandonment finding because mother "often refused opportunities to visit with her children," and "maintained only sporadic communication" with her children after leaving them and moving away); *Sherman B.*, 290 P.3d at 429 (holding same because of father's "minimal and inconsistent contact with [the child]," even though father had some periods of consistent contact); *Steve H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 109, 113

### 2. There was clear and convincing evidence that Felix was in need of aid because of Sally's substance abuse.

Under AS 47.10.011(10), a court may find a child is in need of aid when "the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."

The "[S]tate is not required to wait to intervene until a child has suffered actual harm."[18] And we have upheld a "common-sense finding" that removing "children . . . from their bonded placement" and placing them "in the care of a [parent] who, because of alcohol, is not emotionally or physically stable enough to care for [their] own needs" would place those children "at substantial risk of harm."[19] But a causal link must be established between substance abuse and harm. "Without establishing this causal relationship, 'evidence that shows only the existence of . . . [parental] substance abuse[] or nonconforming social behavior' will not 'by itself' prove beyond a reasonable doubt that the likelihood [of serious harm to the child] required by ICWA exists."[20] Parental rights are not to be terminated "just because parents abuse alcohol or use illegal drugs — what we are focused on is harm to the

---

(Alaska 2019) (holding same due to parent's "prolonged absences and failure to regularly visit or communicate with [the child]"); *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 611 (Alaska 2016) (holding same where parent rarely visited child and "failed to take advantage of the scheduled visitation arranged by OCS").

[18] *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 79 P.3d 50, 54 (Alaska 2003).

[19] *Diana P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 355 P.3d 541, 545-47 (Alaska 2015).

[20] *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 610 (Alaska 2021) (alterations in original) (quoting 25 C.F.R. § 23.121(d)).

child."[21] "The need to prove th[e] link between the parent's conduct and harm to the child recognizes the fact that 'children can thrive . . . even in homes that may not be ideal . . . or when a parent is . . . a substance abuser.' "[22]

The superior court concluded the parents' ability to parent Felix was "substantially impaired" by their substance use and that there was "a substantial risk that the child [would] suffer substantial physical harm as a result of conduct by or conditions" created by the parents. The court found that "there is clear and convincing evidence that each parent continued to use controlled substances" throughout the case, but that neither parent "was willing to submit to any of multiple requests" for sobriety testing throughout much of the case. It noted Sally appeared to be under the influence of methamphetamine during contact with an OCS worker in August 2020. It further noted the testimony of an OCS worker who observed evidence of "illicit narcotics consumption" in Paul's home when Sally was present. It found that Sally had consistently refused drug testing, until on the last day of trial, she submitted evidence of five clean urinalysis tests that she obtained on her own.

Sally challenges the superior court's determination under AS 47.10.011(10) and contends that its conclusion was unsupported by the evidence. She argues the court's finding that the parents "wholly failed to participate in any meaningful manner with treatment or testing" was erroneous because, "despite some occasional setbacks, Sally engaged with treatment and [. . .] by the time of the termination trial, she had made significant progress and appeared to be living a sober lifestyle."

---

[21] *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1018 (Alaska 2022) (noting that this is true "even in non-ICWA cases").

[22] *Id.* at 1010 (quoting U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT at 53 (2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf0).

OCS and the guardian ad litem (GAL) argue Felix was in need of aid because of Sally's substance abuse. They point to evidence of missed drug tests, admissions of substance use during pregnancy and after, and failure to remedy her substance abuse issues.

We hold the superior court correctly determined Felix was a child in need of aid due to Sally's substance abuse. There was clear and convincing evidence that Sally's ability to parent was substantially impaired by substance abuse which resulted in a substantial risk of harm to Felix.

The superior court could reasonably infer from Sally's numerous missed UAs that she continued to use drugs throughout the course of the case. And Sally admitted to using substances while pregnant with Felix, continued to abuse drugs after Felix was removed from her care, and in August 2020 appeared to be under the influence of methamphetamine. There is also a clear causal link between her substance use and a substantial risk of harm to Felix: Sally used substances during the pregnancy, which would have put Felix at substantial risk of harm.[23] We therefore affirm the superior court's determination under AS 47.10.011(10) with respect to Sally.

## B. OCS Made Active Reunification Efforts.

### 1. Active efforts legal framework

"ICWA requires that [b]efore terminating parental rights to an Indian child, a court must find [by clear and convincing evidence] that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[24] ICWA

---

[23] See *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1258-59 (Alaska 2010) (holding drug use during pregnancy can be sufficient to find a child in need of aid based on substance abuse).

[24] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Children's Servs.*, 511 P.3d 553, 560-61 (Alaska 2022) (alterations in original) (internal quotation marks omitted); *see also* 25 U.S.C. § 1912(d); 25 C.F.R. § 23.120(a) (2016); CINA Rule 18(c)(2)(B).

regulations define active reunification efforts as "affirmative, active, thorough, and timely."[25] One hallmark of active efforts is whether OCS has taken "the client through the steps of the plan rather than requiring that the plan be performed on its own."[26] We have emphasized that there is "no pat formula" for determining active efforts,[27] and have repeatedly held that the determination is made in light of OCS's involvement "in its entirety."[28] OCS's efforts need not be perfect.[29] If OCS's involvement is inconsistent, courts may consider "whether . . . the period when active efforts were made compensated for the time during which they were not."[30] Active efforts must be "tailored to the facts and circumstances of the case,"[31] must be decided on a "case-by-

---

[25]   25 C.F.R. § 23.2 (2016).

[26]   *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 982 (Alaska 2019) (quoting *N.A. v. State, Div. of Fam. & Youth Servs.*, 19 P.3d 597, 602-03 (Alaska 2001)).

[27]   *Mona J.*, 511 P.3d at 561 (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)).

[28]   *See, e.g.*, *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008); *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 766 (Alaska 2009).

[29]   *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 478 (Alaska 2013).

[30]   *See, e.g.*, *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (holding that state's failure to make active efforts in a particular seven-month period was "insignificant in light of the extensive remedial efforts the state [had] provided throughout its involvement" with the family apart from that seven-month period); *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607-08 (Alaska 2021) (explaining that failure in one area or for part of the time does not necessarily preclude an active efforts finding over the life of the case).

[31]   25 C.F.R. § 23.2 (2016); *Bill S.*, 436 P.3d at 981.

case basis,"[32] and "must be documented in detail in the record."[33]  But we have also explained that even when documentation is sparse, the superior court may in certain circumstances rely on testimony from OCS caseworkers to establish active efforts.[34]

A parent's unwillingness to change or participate in rehabilitative efforts "does not excuse OCS's failure to make and demonstrate its efforts."[35]  "But OCS has discretion in determining what efforts to pursue based on the case plan and the parent's needs," and courts may consider a parent's "long-standing reluctance or refusal to participate."[36]  "Failed attempts to contact the parent or obtain information from her may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[37]  But we have emphasized that the

---

[32]    *Bill S.*, 436 P.3d at 981.

[33]    *Id.* (quoting 25 C.F.R. § 23.120(b)).  "Documentation is required by ICWA and is critical to compliance with ICWA's purpose and key protections." *Id*. at 983.

[34]    *Id.* at 984 n.33 ("[W]ithout supporting documentation, the quality of a caseworker's testimony must be sufficient to meet the clear and convincing evidence standard.").

[35]    *Id.* at 983.

[36]    *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527, 534 (Alaska 2013); *see also Mona J.*, 511 P.3d at 562-65 (explaining that "a parent's actions have a place in the court's determination of whether OCS's efforts satisfy the ICWA standard" and describing the "ways that a parent's unwillingness to cooperate can impact a court's active efforts analysis"); *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432-33 (Alaska 2015) (affirming active efforts finding where parent's "recovery was stymied by her own evasiveness and apparent lack of interest").

[37]    *Sylvia L.*, 343 P.3d at 433 (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

analysis turns primarily on OCS's efforts, not the parent's behavior.[38] "OCS always has an obligation to make active efforts, regardless of whether a parent cooperates."[39]

In assessing whether OCS made active efforts, we consider specific examples of OCS's efforts throughout the case and then determine whether those efforts were sufficient. Specific efforts may include creating and updating case plans; making referrals to classes and services; calling and scheduling appointments; setting up assessments; arranging visitation; setting up drug testing; providing transportation assistance, vouchers, or bus passes; providing housing or employment assistance; maintaining regular contact with the parent; working with the Tribe; conducting home visits; and other efforts.[40]

### 2. The parents' arguments

Paul argues OCS's efforts did not satisfy ICWA's active efforts requirement, but rather were "only vague and minimal efforts." Paul concedes there were some efforts by the initial caseworker, but argues that there were few active efforts made by the subsequent caseworkers. Paul contends OCS made insufficient efforts to connect him with remedial services, failed to adequately facilitate visitation with Felix, and did not adequately document its efforts.

Sally similarly argues the record does not support the superior court's active efforts determination. Sally urges us to follow *Bill S. v. State, Department of Health & Social Services, Office of Children's Services*, in which we reversed the

---

[38]   *Mona J.*, 511 P.3d at 561-65.

[39]   *Id*. at 564.

[40]   *See, e.g.*, *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1269 (Alaska 2008) (listing efforts and affirming active efforts determination); *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 478 (Alaska 2013) (same); *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271 (Alaska 2011) (same); *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 766 n.38 (Alaska 2009) (same).

superior court's ruling that OCS had successfully engaged in active efforts.[41] She argues that, like the situation in *Bill S.*, the testimony in this case contained mostly vague and generic statements without supporting documentation. Sally argues OCS did not make adequate efforts because it did not sufficiently document the visitation history. Sally further asserts OCS failed to regularly update case plans despite being directed to do so by the court.

### 3. Active efforts analysis

We conclude that, in light of the entire record, there is clear and convincing evidence OCS made active efforts.

OCS engaged in numerous activities that demonstrate active efforts.[42] OCS identified and offered a variety of services that the parents needed, and then went to great lengths to enable the parents to "develop the resources to succeed."[43] OCS created and updated case plans.[44] OCS also made referrals to parenting and emotional

---

[41]    436 P.3d 976, 982-84 (Alaska 2019) (holding OCS did not make active efforts where there was minimal documentation and the only relevant evidence was vague testimony from a single caseworker).

[42]    *See Thea G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 291 P.3d 957, 962 (Alaska 2013) (describing OCS's provision of multiple case plans, multiple referrals, and regular family contact as abundant support for an active efforts finding), *abrogated on other grounds by State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1013-14 (Alaska 2022); *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607 (Alaska 2021); *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071-72 (Alaska 2018).

[43]    *A.A. v. State*, 982 P.2d 256, 261 (Alaska 1999).

[44]    *Jon S.*, 212 P.3d at 764 (affirming active efforts determination, noting that OCS established and updated case plans).

learning classes,[45] counseling services,[46] batterer's intervention or anger management courses,[47] integrated assessments,[48] and violence risk assessments. OCS offered substance use testing and assessments throughout the case.[49] And OCS offered numerous behavioral health services to Paul and Sally.[50]

Critically, OCS's efforts went well beyond case planning and referrals.[51] Early in the case, the initial caseworker made appointments for the parents, told them when they were, and followed up on those appointments.[52] The initial caseworker testified that he talked with Paul frequently, probably more than any other client. The initial caseworker drove Paul to the DMV so he could get a license to gain employment,

---

[45] *Maisy W.*, 175 P.3d at 1269 (affirming active efforts determination, noting that OCS made referrals to parenting classes); *Christopher C.*, 303 P.3d at 478 (same).

[46] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271 (Alaska 2011) (affirming active efforts determination, noting that OCS offered counseling services); *Christopher C.*, 303 P.3d at 478 (same).

[47] *Maisy W.*, 175 P.3d at 1269 (affirming active efforts determination, noting that OCS made referrals to "alternatives-to-violence classes").

[48] *Mona J.*, 511 P.3d at 565-66 (affirming active efforts determination, noting that OCS made referrals to assessments).

[49] *Maisy W.*, 175 P.3d at 1269 (affirming active efforts determination, noting that OCS made referrals to substance abuse assessment); *Mona J.*, 511 P.3d at 565 (affirming active efforts determination, noting that OCS offered urinalysis testing); *Christopher C.*, 303 P.3d at 478 (affirming active efforts determination, noting that OCS arranged substance use assessments).

[50] *Mona J.*, 511 P.3d at 565 (affirming active efforts determination, noting that OCS provided behavioral health services).

[51] *A.A. v. State*, 982 P.2d 256, 261 (Alaska 1999) ("Active efforts require taking a parent through the steps of a plan and helping the parent develop the resources to succeed; drawing up a case plan and leaving the client to satisfy it are merely passive.").

[52] *Mona J.*, 511 P.3d at 565 (affirming active efforts determination, noting that OCS made appointments for parent and followed up with providers).

and another OCS worker provided Sally with a bus pass while in Anchorage.[53] There was frequent communication by text and phone between caseworkers and the parents[54] — referred to as "constant communication" by the fourth caseworker's supervisor — even though the parents were often resistant to communication, and even after Sally moved to Anchorage without providing contact information.[55] OCS made at least one home visit.[56] And OCS involved the Tribe.[57] OCS also made efforts throughout the case to facilitate in-person and video visitation.[58] Unlike in *Bill S.* and contrary to Sally's argument, the existence of specific, active efforts finds support in the record.[59]

In addition to the substantial evidence of OCS's efforts, there is evidence of parental non-participation and resistance. Although the parents' behavior does not excuse OCS from its obligations, we will consider parents' actions and inactions when

---

[53] *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 764 (Alaska 2009) (affirming active efforts determination, noting that OCS got the parents bus passes); *Christopher C.*, 303 P.3d at 478 (holding same where OCS provided transportation assistance for parents).

[54] *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 608 (Alaska 2021) (affirming active efforts finding where OCS, among other actions, maintained consistent "monthly" communication via phone calls and text).

[55] *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1269 (Alaska 2008) (affirming active efforts determination, noting that OCS tried to help the parent even after she moved and refused to give OCS her contact information).

[56] *Jon S.*, 212 P.3d at 764 (affirming active efforts determination, noting that OCS conducted home visits); *Maisy W.*, 175 P.3d at 1269 (same).

[57] *Mona J.*, 511 P.3d at 565-66 (affirming active efforts determination, noting that OCS involved the parent's tribe).

[58] *Maisy W.*, 175 P.3d at 1269 (affirming active efforts determination, noting that OCS arranged visitation with the child); *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271 (Alaska 2011) (same).

[59] *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 982-84 (Alaska 2019).

reviewing active efforts determinations.[60]  Paul's and Sally's non-cooperation seemingly had a significant impact on OCS's ability to make progress with the parents. We have previously affirmed active efforts findings based in part on this type of non-engagement.[61]

Evidence of non-communication and non-cooperation by Sally and Paul included inappropriate behavior and aggression during visitation, refusal to sign forms or releases of information, evasiveness or noncompliance in assessments, resistance to participating in case planning, refusal to consistently take drug tests, and absence of communication.  OCS workers testified that for much of the case the parents were "sporadic" and "half-hearted" in their participation, and that Paul was often aggressive, "combative" and uncooperative.  The parents did not simply exhibit a lack of effort; they seemed to actually obstruct the process.

We reiterate that parental resistance does not eliminate OCS's obligation to make active efforts.[62]  And as Paul and Sally point out, OCS's efforts were not perfect.  For instance, OCS could have done a better job facilitating and documenting visitation;[63] completing and updating case plans; making additional referrals; providing

---

[60]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527, 534 (Alaska 2013); *Mona J.*, 511 P.3d at 562-65.

[61]     *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607 (Alaska 2021); *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (affirming active efforts finding where parent's "recovery was stymied by her own evasiveness and apparent lack of interest").

[62]     *Mona J.*, 511 P.3d at 564-65.

[63]     It is concerning that OCS did not provide any in-person visitation for the parents after October 2020.  OCS claims that this was due to the parents' inappropriate behavior.  With respect to Paul, that position seems reasonable in light of his hostile and aggressive behavior at in-person visitation.  Paul nonetheless counters that OCS should have facilitated access to Zoom technology so he could have video visits.  But whether Paul actually could have accessed Zoom or made video visits work at the time

assistance to navigate specific parts of the case plans later in the case; and documenting its efforts.  But perfection is not the standard; OCS need only make active efforts.

We conclude that OCS met the active efforts threshold.  Although OCS's efforts were at times inconsistent, the entirety of the record demonstrates clear and convincing evidence of OCS's active efforts.[64]  Although OCS failed to update the case plans in the latter part of the case, there was a lengthy period during which the initial caseworker and other caseworkers were actively case planning and facilitating completion of the case plans.  And even though OCS did not facilitate in-person visitation with Felix after October 2020, there were extended periods of time in which OCS made active efforts to support in-person visitation.  This case was drawn out over years, and OCS made substantial, active efforts throughout much of the case.  Moreover, OCS's documentation, supplemented by robust testimony, sufficiently supported an active efforts determination.[65]

---

OCS offered them is a credibility issue that requires deference to the superior court's finding, and the superior court gave little credit to Paul's representations.

Whether OCS justifiably failed to provide Sally with in-person visitation is a closer question.  The fourth caseworker stated that it was due to Sally's "behaviors in the office," like "not following the guidelines for visitation" and "arguing."  This seems an insufficient justification for not allowing in-person visitation for over one year; it is unclear whether OCS had a valid reason for not providing Sally with in-person visits.  But this omission is not so significant that it means OCS did not make active efforts with respect to Sally, especially because OCS continued to provide Sally with video visitation, which she only attended sporadically.

[64]    *See Walker E.*, 480 P.3d at 607-08 (explaining that failure in one area or for part of the time does not necessarily preclude an active efforts finding over the life of the case).

[65]    Although OCS's documentation was somewhat sparse, the testimony of numerous different caseworkers adequately supplemented the documentation.  *Cf. Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 984 n.33 (Alaska 2019).  The superior court heard detailed testimony from several different OCS caseworkers as well as from the parents' service providers, Sally's advocate at the women's shelter, Tribal employees, and others.  And the superior court was able to make detailed findings based on this testimony.  This is completely unlike the situation

One of the hallmarks of active efforts is that OCS must walk the parents through the case plan, rather than requiring them to do it on their own.[66] But the parents must be willing to walk with OCS. Here, the parents repeatedly resisted OCS's efforts and failed to meaningfully engage with the services offered. Faced with Paul's and Sally's non-cooperation, OCS continued to make efforts and communicate with the parents.[67] Considering the entire record and the parents' "unwillingness to change or participate in rehabilitative efforts," we conclude that OCS made active efforts.[68]

### C. Due Process

#### 1. Sally's due process rights were not violated.

After the termination trial had ended but before the superior court issued its order, Sally filed a motion under CINA Rule 19.1(d) and asked the court to review additional information unavailable during trial regarding her "continued sobriety" and "now regular face-to-face visits with" Felix. Sally claimed that, for the approximately two previous months, she had been having almost weekly in-person visits with Felix. She also proffered evidence of continued sobriety and compliance with treatment. The superior court ruled that it would be inappropriate to consider conduct occurring after the close of evidence, and that in any event Sally's proffered evidence would not have affected its decision. Sally now contends that her evidence could have altered the superior court's decision and that the superior court's ruling denied her due process.

---

in *Bill S.*, where we held that the vague, "skeletal" testimony of a single OCS caseworker was insufficient to demonstrate active efforts. *Id.* at 982-84.

[66] *Id.* at 982.

[67] *Mona J.*, 511 P.3d at 566 ("[T]his case is an example not of OCS stopping active efforts in the face of a parent's noncooperation but of OCS persisting despite resistance [sic] and changing course when necessary.").

[68] *Bill S.*, 436 P.3d at 983 (explaining that a parent's actions should be given due consideration but do not excuse a failure to make active efforts).

OCS and the GAL argue that any error was harmless; that Sally suffered no prejudice; and that there was no due process violation. Sally responds that even though the trial court found that her proffered evidence would not have affected its ruling, its conclusion was erroneous because Sally explicitly requested the opportunity to present evidence at an evidentiary hearing, which may have swayed the court.

We conclude that the superior court did not abuse its discretion and did not violate Sally's due process rights by denying Sally's motion for review.[69] The superior court accepted Sally's representations as true, but still concluded that they would not have affected its determination: it was "too little, too late." It is certainly commendable that Sally was making progress toward sobriety and had recently resumed in-person visitation with Felix. But a recent period of sobriety does not necessarily suffice to remedy a long history of substance abuse;[70] Sally's recent sobriety would not necessarily have affected the outcome.

The superior court properly reasoned that after a trial spanning nine months, and four years of state custody, Felix's interests would not be served by prolonging the proceedings to hear evidence that the court had already concluded would not affect its ruling. For these reasons, the superior court's ruling was not error.

### 2. Paul's due process rights were not violated.

Paul argues his due process rights were violated when the superior court commenced the termination trial without him physically present. Paul requested to be present in person. He informed the court he would be away for fishing season during the trial, and requested a delayed trial date in September 2021, rather than July. The superior court then made oral findings determining there was not good cause to continue the termination trial. The court made accommodations to allow Paul a meaningful

---

[69]     A denial of a motion to re-open evidence is reviewed for abuse of discretion. *Snider v. Snider*, 357 P.3d 1180, 1184 (Alaska 2015).

[70]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 74 P.3d 896, 902-03 (Alaska 2003).

opportunity to participate in person:  after the initial proceedings and once the fishing season ended, it would allow Paul to reopen evidence and require the State to recall witnesses.

Paul contends that, under the *Mathews v. Eldridge*[71] framework, his due process rights were violated when the termination trial commenced without him present in person.  He argues that his situation is different than that in *Alyssa B. v. State, Department of Health & Social Services, Division of Family & Youth Services*, a case in which we held that "extraordinary circumstances existed" for the superior court to conduct the termination trial without the parent.[72]  Paul argues that, unlike the parent in *Alyssa B.*, he expressed a desire to be present at the trial, made efforts to be present, and did not try to delay the trial.  Paul further contends that he was unable to fully participate through appearance by phone because his fishing job distracted him and he was unable to discreetly discuss the proceedings with his counsel.  Paul asserts the superior court could have protected his due process rights by simply scheduling the trial to begin two months later as he requested.

OCS argues in response that Paul's telephonic participation satisfied due process and that Paul's interests were adequately protected.  OCS correctly points out that due process does not require courts to allow in-person participation in all circumstances.[73]  It is thus appropriate to consider whether telephonic participation at the commencement of the trial provided Paul with due process.

We analyze due process claims under the *Mathews* balancing test.[74]  This test considers three factors:  (1) the individual interest at stake, (2) the risk of erroneous

---

[71]     424 U.S. 319, 334-35 (1976) (setting out three-part balancing test).

[72]     165 P.3d 605, 615 (Alaska 2007).

[73]     *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 54 (Alaska 2017).

[74]     *Id.* at 49; *Mathews*, 424 U.S. at 334-35.

deprivation of such interest and the probable value of additional procedural safeguards, and (3) the competing governmental interest.[75] "The crux of due process is opportunity to be heard and the right to adequately represent one's interests."[76]

Applying *Mathews*, we conclude that Paul's due process rights were not violated. First, we agree with OCS and Paul that a termination trial affects a significant individual interest.[77] Second, the additional safeguard of delaying the trial by two months would not have reduced the risk of erroneous deprivation of that interest. As OCS correctly notes, even though the trial continued for nine months — well past Paul's requested two-month deferral — he *never* attended in person. Because Paul had many opportunities to attend in person, but chose not to do so, we are not persuaded that a two-month delay of the start of the trial would have made a difference. The superior court also provided Paul with other procedural safeguards, including opportunities to consult with his counsel off record, testify in person, reopen evidence, and require the State to recall witnesses after the fishing season ended. These accommodations adequately protected Paul's interests. Third, OCS had a compelling interest in proceeding to trial. Felix had been in OCS custody for most of his young life and needed permanency; further delaying an already-protracted termination trial would impair the State's compelling interest.

Paul was given an opportunity to be heard, and there were sufficient safeguards in place to protect his interests. It is clear that Paul's due process rights were

---

[75]     *Alyssa B.*, 165 P.3d at 614 (citing *D.M. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000)); *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 71 P.3d 811, 831 (Alaska 2003) (citing *Mathews*, 424 U.S. at 335).

[76]     *In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991) (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).

[77]     *See Richard B.*, 71 P.3d at 831.

not violated when the superior court commenced the trial without Paul's physical presence.

V.    **CONCLUSION**

We AFFIRM the superior court's order terminating both parents' parental rights.